# BROWN & HOFMEISTER, L.L.P.

740 East Campbell Road
Suite 800
Richardson, Texas 75081

**EDWIN P. VOSS, JR.**
**Board Certified,**
**Civil Appellate Law**
**Texas Board of Legal Specialization**
**(214) 747-6135**
evoss@bhlaw.net

Telephone: (214) 747-6100
Telecopier: (214) 747-6111
www.bhlaw.net

October 4, 2023

Lyle W. Cayce, Clerk                    <u>**VIA ECF Filing Procedures**</u>
United States Court of Appeals, Fifth Circuit
600 S. Maestri Place
New Orleans, Louisiana 70130-3408

Re:    *Baker v. City of McKinney, Texas,* Appeal No. 22-40644

Dear Mr. Cayce:

This letter is submitted pursuant to Fed.R.App.P. 28(j) to provide the Court with a citation to supplemental authority because a pertinent and significant case has come to Appellant's attention after the oral argument held by the Court on June 6, 2023. The authority is *Slaybaugh v. Rutherford County, Tennessee*, 2023 WL 5498052, at \*\*5-12, No. 3:23-CV-00057 (M.D. Tenn., Aug. 24, 2023). This case reviewed, *inter alia*, whether the takings clause under the Fifth Amendment to the United States Constitution applies to provide a remedy where the lawful exercise of law enforcement authority to enforce criminal law caused damage to a residence. The *Slaybaugh* decision analyzed several case authorities, many of which have been cited and relied upon by Appellant and Appellee in this case, and concluded that "the weight of authority indicates that claims based on damages caused by the exercise of police power in the course of enforcing criminal laws do not provide a basis for taking claims under the Fifth Amendment." *Id.*, at \*12. The *Slaybaugh* opinion also discussed the district court's decision in this case. *Id.*, at \*\*7-8.

Whether a takings claim under the Fifth Amendment applies to law enforcement actions that cause property damage is an issue addressed in: (1) the Brief of Appellant City of McKinney, Texas, filed December 22, 2022, at pages 14-29; and (2) the Reply Brief of Appellant City of McKinney, Texas, filed February 13, 2023, at pages 4-7. During oral argument on June 6, 2023, this constitutional issue was discussed with the Court. A copy of the *Slaybaugh* decision is attached for the Court's convenience. The *Slaybaugh* decision is now pending appeal at the Sixth Circuit Court of Appeals under Appeal No. 23-5765.

By copy of this letter, the undersigned certifies that all counsel of record are receiving a copy of this supplemental authority citation. The undersigned further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) this electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) this document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Clerk, United States Court of Appeals, Fifth Circuit
October 4, 2023
Page 2

Yours very truly,

*/s/ Edwin Armstrong Price Voss, Jr.*
Edwin Armstrong Price Voss, Jr.
*Counsel for Appellant*
*City of McKinney, Texas*

EPV:dl

cc:     Jeffrey H. Redfern, Esq. ***Via ECF Service***
        William R. Aronin, Esq. ***Via ECF Service***
        Robert McNamara, Esq. ***Via ECF Service***
        Suranjan M. Sen, Esq. ***Via ECF Service***
        Timothy A. Dunn, Esq. ***Via ECF Service***
        Sam Spiegelman, Esq. ***Via ECF Service***
        David S. Coale, Esq. ***Via ECF Service***

WESTLAW CLASSIC

 **Appeal Filed by** MOLLIE SLAYBAUGH, ET AL v. RUTHERFORD COUNTY, TN, ET AL,   6th Cir.,  August 25, 2023 (TEXT NOT AVAILABLE)

**Slaybaugh v. Rutherford County, Tennessee**
United States District Court, M.D. Tennessee, Nashville Division.   August 24, 2023   Slip Copy   2023 WL 5498052   *(Approx. 14 pages)*

United States District Court, M.D. Tennessee, Nashville Division.

Mollie SLAYBAUGH and Michael Slaybaugh, Plaintiffs,

v.

RUTHERFORD COUNTY, TENNESSEE, Rutherford County Sheriff's Department, and
The Town of Smyrna, Tennessee, Defendants.

Case No. 3: 23-cv-00057
Filed August 24, 2023

### Attorneys and Law Firms

Daniel A. Horwitz, Lindsay E. Smith, Melissa Kathleen Dix, Horwitz Law, PLLC, Nashville, TN, for Plaintiffs.

Laws M. Bouldin, Nick C. Christiansen, Hudson, Reed & Christiansen PLLC, Murfreesboro, TN, Hannah Grace Moore, Robert M. Burns, Howell & Fisher, PLLC, Nashville, TN, Jeffrey L. Peach, Town of Smyrna Office of Town Attorney, Smyrna, TN, for Defendants The Town of Smyrna, Tennessee.

### MEMORANDUM

ALETA A. TRAUGER, United States District Judge

*\*1* Plaintiffs Mollie Slaybaugh and Michael Slaybaugh bring a Complaint (Doc. No. 1) asserting claims both directly under the Fifth Amendment to the United States Constitution and under 42 U.S.C. § 1983, based upon a violation of their rights pursuant to the Takings Clause (Count I), and under article 1, section 21 of the Tennessee Constitution (Count II). Their claims are premised upon the substantial damage inflicted on their home by law enforcement officers during the apprehension and arrest of their adult son for homicide. Now before the court are the Motions to Dismiss the plaintiffs' Complaint filed by (1) defendant the Town of Smyrna, Tennessee (the "Town") (Doc. No. 14) and (2) defendants Rutherford County, Tennessee ("County") and the Rutherford County Sheriff's Department ("RCSD") (Doc. No. 21). For the reasons set forth herein, the motions will be granted.

### I. BACKGROUND

According to the plaintiffs' account of events as set forth in the Complaint, which the court accepts as true for purposes of the defendants' Motions to Dismiss, the Slaybaughs are residents of Rutherford County, Tennessee and the owners of a home located in Smyrna, within Rutherford County. On January 23, 2022, Mollie Slaybaugh's adult son, James Jackson Conn, who resided elsewhere, asked to visit her at the plaintiffs' home for a few days. Ms. Slaybaugh agreed. Conn apparently entered the home at that time. It appears that Mr. Slaybaugh was not at home.

Later that evening, while preparing for bed, Ms. Slaybaugh noticed two police cars parked at her neighbor's house, and she opened her front door to "check on her neighbor." (Doc. No. 1 ¶ 15.) She was met at her front door by a police officer—with a drawn gun—who instructed her to come out of the house. Ms. Slaybaugh realized at this point that there were approximately twenty-five police cars from both the Smyrna Police Department ("SPD") and the RCSD outside her house.

The police officers, using a loudspeaker, instructed Conn to come out of the house with his hands in the air. He refused to come out. Police officers denied Ms. Slaybaugh's request to go back into her house to try to convince him to come out. She was told that her son was wanted for questioning in connection with a homicide. This was the first time Ms. Slaybaugh had heard anything about her son's alleged involvement in a murder.

Officers with the SPD and RCSD stayed outside the house for several hours, while Ms. Slaybaugh spent the night at her daughter's house nearby. The plaintiffs do not allege that any damage occurred to their home during this window of time. Ms. Slaybaugh walked back to her home early the next morning. She encountered a road block set up near her house by law enforcement officers and learned that a warrant for the arrest of her son had been issued. Conn still had not come out of the house. Ms. Slaybaugh again asked and was

Slaybaugh v. Rutherford County, Tennessee | Cases | Tennessee | Westlaw

denied the opportunity to speak to Conn to convince him to leave the house, and she was not permitted to re-enter her home.

*2 The plaintiffs do not provide a time frame for the ensuing events, but they allege that, in the course of executing the arrest warrant,[1] the police caused extensive damage to the exterior and interior of the plaintiffs' home, including by firing approximately thirty-five cannisters of tear gas into the house, which resulted in the plaintiffs having to take the house "down to the studs to repair the damage." (Doc. No. 1 ¶ 25.) "Cannisters of tear gas were lodged into the drywall, flooring was burnt, and nearly-new furniture was destroyed by the Defendants' intentional actions.... The entire house was in disarray, with windows broken, door frames destroyed, doors ripped off the frames, and glass and insulation scattered in several rooms." (Id. ¶ 26.) Photos of the home substantiate this assertion. (See Doc. No. 1-1.)

After this incident, the plaintiffs requested that the defendants compensate them for the cost of repairing the damage to their home. The RCSD responded to the request in writing, denying "responsibility for any damage to [the plaintiffs'] home." (Doc. No. 1-2.) The Town denied the request in a telephone call. The plaintiffs allege that the cost of repairs, to date, has been approximately $70,000.[2]

Based on these factual allegations, the plaintiffs assert that the defendants "blew up [their] home for public use." (Doc. No. 1 ¶ 27.) More specifically, they claim that "[a]pprehending an individual accused of perpetrating a homicide is in the public interest" and that "destroying private property while doing so constitutes a taking for public use," the cost of which should be "borne by the public, not innocent homeowners who attempted to assist law enforcement." (Id. ¶ 35.) They assert that the defendants violated their Fifth Amendment right to "just compensation" for the taking of private property for public use when they denied the plaintiffs' requests for compensation.

The plaintiffs bring a claim for the violation of this right directly under the Fifth Amendment as "self-executing," but they also state a claim through 42 U.S.C. § 1983, based on violation of the same right. (Doc. No. 1 ¶ 37.) In addition, they bring a parallel claim under article 1, section 21 of the Tennessee Constitution. (Id. ¶¶ 39–41.) They seek damages and attorney's fees.

The defendants responded to the Complaint by filing their Motions to Dismiss and supporting Memoranda of Law, which rely on Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 14, 15, 21, 22.) The plaintiffs filed a consolidated Response to both motions (Doc. No. 24), and the defendants filed separate Reply briefs (Doc. Nos. 31, 32.) Following the completion of briefing, the plaintiffs filed a Notice of Supplemental Authority to bring to the court's attention the Sixth Circuit's opinion in *Knight v. Metropolitan Government*, 67 F.4th 816 (6th Cir. 2023), issued just over a month after the plaintiffs filed their Response.[3]

## II. LEGAL STANDARD

*3 In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). While Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

When presented with a Rule 12(b)(6) motion, the court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## III. ANALYSIS

The Town argues in support of its motion that (1) the plaintiffs' claim under § 1983 must be dismissed, because the plaintiffs fail to allege that their damages were caused by a specific "policy or custom" of the Town, as required for municipal liability under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (2) the claim brought directly under the Fifth Amendment must be dismissed, because property damage caused by an exercise of police power is not compensable as a Fifth Amendment "taking"; and (3) the claim for the alleged violation of the Tennessee Constitution must be dismissed, because Tennessee does not recognize a private right of action for violations of the state Constitution. (Doc. No. 15.)

In addition to those arguments, the County and the RCSD contend that, contrary to the plaintiffs' assertion, the Fifth Amendment is not "self-executing" and that violations of it can only be brought through § 1983. (Doc. No. 22, at 2.) They also assert that the claims against the RCSD must be dismissed, simply because the RCSD is not an entity capable of being sued. (Id. at 1, 7.)

### A. The RCSD Is Not a Suable Entity

As the RCSD points out, the "federal district courts in Tennessee have frequently and uniformly held that police departments and sheriff's departments are not proper parties to a § 1983 suit." *Mathes v. Metro. Gov't*, No. 3:10-CV-0496, 2010 WL 3341889, at *2 (M.D. Tenn. Aug. 25, 2010) (Trauger, J.) (collecting cases); *accord Campbell v. Cheatham Cty. Sheriff's Dep't*, 511 F. Supp. 3d 809, 824–25 & n.12 (M.D. Tenn. 2021)

(Crenshaw, C.J.) (dismissing the § 1983 claim against the sheriff's department as redundant of the claim against the county, and also noting that sheriff's departments "are not proper parties to a § 1983 suit"), *aff'd*, 47 F.4th 468 (6th Cir. 2022). [4]

*\*4* Nor are sheriff's departments proper defendants for claims under Tennessee law. The Tennessee Code delineates sheriffs' responsibilities, Tenn. Code Ann. § 8-8-201, provides that sheriff's offices are to be funded by county governing bodies, *id.* § 8-20-120, and further provides that any person incurring an injury "resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against *the county* in which the sheriff serves," *id.* § 8-8-302(a) (emphasis added). The RCSD is listed on Rutherford County's website as a division within the County. *See* https://rutherfordcountytn.gov/. The plaintiffs have not pointed to any authority under Tennessee law that would make the RCSD a proper entity to be sued under state law.

The court concurs with the great weight of authority, finding that the RCSD is not a suable entity under § 1983 or state law. That portion of the Motion to Dismiss filed by the RCSD and the County, therefore, will be granted. This conclusion has no practical effect, however, as the claims against the RCSD are simply redundant of, and subsumed by, the claims against the County itself. *Accord Campbell*, 511 F. Supp. 3d at 824.

### B. Whether the Fifth Amendment Is "Self-Executing"

The plaintiffs purport to bring their federal takings claim directly under the Fifth Amendment to the United States Constitution, asserting that this amendment is "self-executing." (Doc. No. 1 ¶ 37.) In support of the proposition that the Fifth Amendment is self-executing, such that they would not need § 1983 to bring the claim, the plaintiffs cite *Knick v. Township of Scott*, 139 S. Ct. 2162, 2171 (2019). *Knick*, however, stands only for the proposition that a property owner does not first have to exhaust state court remedies—for instance, by bringing a state inverse condemnation proceeding—before pursuing relief in federal courts for a taking without compensation. Rather, as the Court recognized, "the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court *under § 1983* at that time." *Id.* at 2168 (emphasis added) (overruling *Williamson Cty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985)). And the Sixth Circuit has "long held that § 1983 provides the exclusive remedy for constitutional violations." *See, e.g., Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014) (citations omitted).

In any event, the court has no need to resolve the dispute regarding whether the Fifth Amendment is self-executing, because Congress, with the passage of § 1983, provided a statutory mechanism for pursuing claims for constitutional violations (including violations of the Fifth Amendment), and the plaintiffs here have filed suit under § 1983. Thus, a conclusion that the Fifth Amendment is self-executing would have no practical effect on this litigation either, because the plaintiffs have brought a single takings claim under both the Fifth Amendment and § 1983. The court will deem the claim to arise under § 1983.

### C. The Plaintiffs Adequately Allege That Their Injuries Were Caused by Municipal Policies

A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). One of the ways a plaintiff can make a showing of an illegal policy or custom is by "actions taken by officials with final decision-making authority." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.

*\*5* The Town and County both argue here that the plaintiffs cannot bring a viable claim under § 1983, because they fail to allege the "existence of an official policy or custom that was the moving force behind any alleged constitutional violation." (Doc. No. 22, at 10; *see also* Doc. No. 15, at 6 ("Plaintiffs have failed to ... allege any specific 'policy or custom' through which the Town caused harm.").)

Neither municipal defendant attempts to identify the alleged constitutional violation at issue here. The Complaint, however, makes it clear that the challenged actions—the actions giving rise to the plaintiffs' claims under the Fifth Amendment—are the Town's and County's respective denials of the plaintiffs' claim for compensation after agents for the municipalities destroyed their home in the course of effecting Conn's arrest. In other words, the plaintiffs do not challenge the arrest or the right of the arresting officers to take whatever actions were reasonably necessary to effect the arrest of a dangerous fugitive. They challenge the Town's and County's denial of responsibility for compensating the plaintiffs for the destruction caused during the course of executing the arrest warrants. The RCSD's denial letter was on RCSD letterhead reflecting Sheriff Michael S. Fitzhugh's name. It was signed by Captain Kyle Evans, Staff Attorney, and states that the " RCS[D] denies responsibility for any damage to your home." (Doc. No. 1-2.) This statement was clearly made by Evans in his capacity as spokesperson for the RCSD and can only be understood as communicating the RCSD's—and the County's—official policy of not compensating individuals who claim damages to their home and property incurred in the course of a lawful arrest. In other words, the decision was apparently made by an "official[ ] with final decision-making authority." *Thomas*, 398 F.3d at 429. Although the Town's response to a similar request was by telephone rather than in writing, the Complaint gives rise to the reasonable inference that the Town has a similar policy, similarly enforced by an individual with final decision-making authority, that required the denial of the plaintiffs' request for compensation.

Slaybaugh v. Rutherford County, Tennessee | Cases | Tennessee | Westlaw

In short, the Complaint adequately alleges that the plaintiffs' injury was directly caused by policies attributable to the Town and the County.

### D. Whether the Plaintiffs State a Colorable Claim Under § 1983

The defendants argue that the plaintiffs' takings claim under § 1983 is subject to dismissal, because the Fifth Amendment does not create a right to recovery for property damage resulting from the exercise of police power—that is, in this case, from the execution of a valid arrest warrant and the lawful arrest of a fugitive reasonably believed to be armed and dangerous.

#### 1. The Takings Clause

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides simply that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Historically, the Supreme Court has recognized that, "when the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)). Obvious physical takings of the type that categorically require compensation occur, for example, when the government uses the power of eminent domain to formally condemn a property, when it takes physical possession of property without acquiring title to it, or when it "occupies property—say, by recurring flooding as a result of building a dam." *Id.* (citations omitted). These types of takings are subject to a "simple, *per se* rule: The government must pay for what it takes." *Id.*

**\*6** A different standard applies to those situations in which the government, rather than physically appropriating property, "instead imposes regulations that restrict an owner's ability to use his own property." *Id.* In these situations, the Court prescribes a different standard, one that has continued to evolve. *Id.* (citations omitted). The Supreme Court recognizes that not all restrictions on the use of property are "takings," but that, if a regulation "goes too far it will be recognized as a taking." *Id.* (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). To assess whether a regulation on a property owner's use of her own property "goes too far," courts continue to use the test first developed in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectation, and the character of the government action." *Cedar Point*, 141 S. Ct. at 2072 (citing *Penn Cent.*, 438 U.S. at 124).

In *Cedar Point*, the Court clarified that, although it has previously distinguished between "physical takings" and "regulatory takings," the labels are misleading, because "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* That is, the controlling question is not whether the source of the taking is a statute or regulation. Instead, the "essential question" is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* (citing *Tahoe-Sierra*, 535 U.S. at 321–23). Applying that rule, it found that the regulation at issue in that case—which granted union organizers the right to "physically enter and occupy the growers' land for three hours per day, 120 days per year" in order to solicit the growers' employees to join the union—appropriated the land owners' right to exclude, which the Court recognized as "one of the most treasured rights of property ownership." *Id.* (internal quotation marks and citation omitted). Because the regulation appropriated a right inherent in property ownership, rather than restricting the land owners' use of their own property, the regulation effected a *per se* taking, akin to an easement or servitude, that required compensation, without resort to *Penn Central*'s balancing test. *Id.* at 2073–74. The temporary nature of the physical invasion permitted by the regulation did not make it less a physical invasion; instead, the duration of the appropriation "bears only on the amount of compensation" due. *Id.* at 274.

In reaching this conclusion, the Court reiterated some long-standing principles pertaining to property rights, including that "property rights protected by the Takings Clause are creatures of state law." *Id.* at 2076 (citations omitted). And it denied that its holding would, as the dissent feared, "endanger a host of state and federal government activities involving entry onto private property." *Id.* at 2078. The Court specifically recognized that its holding had no bearing on those "government-authorized physical invasions" that are "consistent with longstanding background limitations on property rights." *Id.* at 2079. Such "background limitations" include "traditional common law privileges to access private property," such as the common law privilege to "enter property to effect an arrest or enforce the criminal law under certain circumstances." *Id.* (citing Restatement (Second) of Torts §§ 204–05 (1964)).[5] Further, the Court noted that "government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners." *Id.* (citing *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)).

#### 2. The Parties' Positions

**\*7** Again, in this case, citing *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. (13 Wall) 166 (1871), the plaintiffs allege that "apprehending an individual accused of perpetrating a homicide is in the public interest, and destroying private property while doing so constitutes a taking for public use" that is compensable under the Fifth Amendment. (Doc. No. 1 ¶¶ 33, 35.) In support of their Motions to Dismiss, the defendants argue that *Cedar Point* reaffirms that law enforcement has the right to enter property to arrest a suspect or to enforce criminal law without owing compensation and, further, that such action does not constitute a taking. The defendants also argue that every federal appellate court confronted with the issue, along with nearly every federal district court, has held that the Fifth Amendment does not create a cause of

Slaybaugh v. Rutherford County, Tennessee | Cases | Tennessee | Westlaw

action for damage to property caused by law enforcement in the course of apprehending a dangerous fugitive in accordance with the Fourth Amendment. And the only authority to the contrary is a single case from the Eastern District of Texas, *Baker v. City of McKinney*, 601 F. Supp. 3d 124 (E.D. Tex. 2022).

In response, the plaintiffs rely heavily on *Baker*, and they argue that the significant damage to their home constitutes a *per se* taking that triggers their right to compensation. While asserting that the taking is a *per se* taking for which just compensation is due, they also argue that the Motions to Dismiss should be denied, because "takings claims 'turn on situation-specific factual inquiries' that are ill-suited for resolution at the motion-to-dismiss stage" (Doc. No. 24, at 7 (citing, among others, *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 37 (2012); *Penn Cent. Transp.*, 438 U.S. at 124 (1978) (takings claims turn on " 'the particular circumstances' " involved and require "essentially *ad hoc*, factual inquiries"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982)). They also assert that (1) the Supreme Court has never embraced a categorical "police power" exception to the Fifth Amendment; (2) *Cedar Point* weighs in their favor, as the Supreme Court acknowledged only a law enforcement privilege to *enter* property to effect an arrest, not a privilege to destroy the property in the process and that the case actually stands for the proposition that, to answer the question of whether a taking occurred, courts should not look to the source of the authority but to the effect of the government action; and (3) none of the cases cited by the defendants persuasively supports their position. (Doc. No. 24, at 11–19.)

In their Replies, the defendants point out that, while the plaintiffs ask the court to apply the *per se* rule that applies to physical takings, they simultaneously claim that dismissal is inappropriate because the fact-intensive inquiry required for regulatory takings is necessary. (Doc. No. 32, at 1–2.) And they continue to argue that the weight of authority is in favor of applying a categorical rule to claims like this one.

### 3. Discussion

*Baker v. City of McKinney* indeed involves a factual pattern similar to that presented here. There, a homeowner's daughter called the police department to report that an armed fugitive had entered the homeowner's house with a teenage girl and requested to hide his car in the garage. The daughter provided police with the code to enter the house and the garage door opener. The police went to the home, where the fugitive remained in hiding with the teenage girl. 571 F. Supp. 3d at 629. The fugitive eventually released the girl, who told police that the fugitive had seven firearms and refused to leave the house alive. Further negotiations proved unsuccessful, so the police tried to induce the fugitive to leave by deploying tear gas. They eventually resorted to forcefully entering the home with a "tank-like vehicle know as a Bear Cat," in the process of which they ran over the backyard fence and broke down both the front and garage doors, causing over $50,000 in damage. *Id.* at 629, 637. Once inside, they discovered the fugitive had already taken his own life. *Id.*

*\*8* The homeowner filed suit against the City of McKinney for violation of the Takings Clauses of the United States and Texas Constitutions, alleging that the police action had caused extensive damage to her home. Among other arguments raised in support of its Rule 12(b)(6) motion, the City maintained that the police action—a "legitimate exercise of the police power"—did not constitute a compensable taking. *Id.* at 635–36. The plaintiff did not dispute that the police department's actions were a valid exercise of the state's police power. Instead, her position was that "exercises of the police power are susceptible to a takings analysis." *Id.* (alterations omitted).

The district court acknowledged that other circuits "have foreclosed recovery under similar circumstances" but nonetheless declined to adopt a categorical rule to the effect that the "destruction of private property resulting from the exercise of valid police power cannot constitute a Fifth Amendment Taking." *Id.* at 636. The court found that the Fifth Circuit and the Supreme Court had both suggested that such action "*could* amount to a taking." *Id.* (citing *John Corp. v. City of Houston*, 214 F.3d 573 (5th Cir. 2000);[6] *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992); and *Tahoe-Sierra*, 535 U.S. at 342)). In particular, the court noted that the Supreme Court in *Tahoe-Sierra* cautioned against the " 'temptation to adopt what amount to *per se* rules in either direction' of the takings analysis." *Id.* at 636 (quoting *Tahoe-Sierra*, 535 U.S. at 342). The court found the Fifth Circuit's and Supreme Court's "reasoning persuasive, particularly at this stage of litigation where it construes allegations in the light most favorable to [the plaintiff]." *Id.* Concluding that the plaintiff had "plausibly alleged [that] the City's destruction of her home resulting from the exercise of its police power *could* amount to a taking" and that the City's refusal to compensate her for that damage "plausibly amounts to a Fifth Amendment violation," the court denied the City's motion to dismiss. *Id.* at 637.

As previously noted, the plaintiffs here rely heavily on *Baker*. They recognize that it is an outlier, but they contend that it is the only factually on-point case issued post-*Cedar Point Nursery* and that its cautious approach is called for here, where the determination of "whether a government's behavior .... rises to the level of a 'physical appropriation[ ]' that is *per se* compensable requires a fact-specific inquiry." (Doc. No. 24, at 8.) The court, however, is not persuaded that a "fact-specific inquiry" is necessary where, on a motion to dismiss, the court presumes the truth of the plaintiffs' allegations in the Complaint. The question presented is one of law: whether the facts as alleged by the plaintiffs give rise to a viable claim under the Takings Clause of the Fifth Amendment. The plaintiffs themselves do not contend that the destruction of their property was a regulatory taking of the type that requires *Penn Central*'s balancing test (as was also involved in *Tahoe-Sierra*). Rather, they claim a *per se* taking that requires compensation without any such balancing. Nothing in *Cedar Point*, however, suggests that the government action in this case constitutes a taking. Rather, as set forth above, *Cedar Point* expressly recognized that law enforcement officers enjoy a common law "privilege to

Slaybaugh v. Rutherford County, Tennessee | Cases | Tennessee | Westlaw

enter property to effect an arrest or enforce the criminal law" and that, because property owners "traditionally
had no right to exclude an official engaged in a reasonable search, government searches that are consistent
with the Fourth Amendment and state law cannot be said to take any property right from landowners." *Cedar
Point Nursery*, 141 S. Ct. at 2079. In other words, such actions are not "takings."

**\*9** The federal appellate courts that have considered similar situations have uniformly concluded as much.
For instance, in *Lech v. Jackson*, 791 F. App'x 711 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 160 (2020), the
plaintiffs' home was effectively destroyed during police officers' apprehension and arrest of an armed and
dangerous criminal suspect who had broken into the home in order to evade capture. In the course of the
nineteen-hour standoff between police and the suspect, including hours of attempts to negotiate, the police
officers used "increasingly aggressive tactics" that ultimately rendered the home uninhabitable. *Id.* at 713.
The city offered to help the plaintiffs with "temporary living expenses" while they demolished and rebuilt their
home but otherwise denied liability and declined to provide further compensation. *Id.* The plaintiffs brought
suit, asserting that the defendants—individual police officers and the city—violated their rights under the Fifth
Amendment when they destroyed the plaintiffs' home without just compensation.

The district court granted summary judgment in favor of the defendants, distinguishing between the state's
power under eminent domain to take private property for public use and its "police power, which allows [it] to
regulate private property for the protection of public health, safety, and welfare," and holding that the exercise
of the latter never triggers the requirement of just compensation under the Fifth Amendment. *Id.* at 714. The
court also found that the apprehension of a criminal suspect fell within the scope of the state's police powers
such that no taking occurred. *Id.*

On appeal, the plaintiffs took issue with the district court's conclusion that the exercise of a state's police
power can *never* constitute a taking for purposes of the Fifth Amendment. They argued, much like the
plaintiffs here, that the police officers' intrusion upon the plaintiffs' property and destruction of their home
constituted a physical appropriation of their property and that any such "physical appropriation of [private]
property by the government—whether committed pursuant to the power of eminent domain or the police
power—gives rise to a *per se* taking and thus requires compensation under the Takings Clause." *Id.* at 715
(internal quotation marks omitted).

The Tenth Circuit rejected this argument, noting that at least three other circuit courts and the Court of
Federal Claims had "expressly relied on the distinction between the state's police power and the power of
eminent domain in cases involving the government's direct physical interference with private property." *Id.*
(citing *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1150, 1153–54 (Fed. Cir. 2008) (holding that no
taking occurred where the government physically seized (and ultimately "rendered worthless") the plaintiff's
pharmaceuticals "in connection with [a criminal] investigation" because "the government seized the
pharmaceuticals in order to enforce criminal laws"—an action the court found to fall well "within the bounds of
the police power" (citing *Bennis v. Michigan*, 516 U.S. 442, 443–44, 452–53 (1996))); *Zitter v. Petruccelli*, 744
F. App'x 90, 93, 96 (3d Cir. 2018) (relying on the distinction between the power of eminent domain and police
power to hold that no taking occurred when officials physically seized plaintiff's oysters and oyster-farming
equipment (citing *Bennis*, 516 U.S. at 452)); *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 333–34, 336 (7th Cir.
2011) (relying on the distinction between the power of eminent domain and police power to hold that no taking
occurred where authorities physically damaged plaintiff's home (citing *Bennis*, 516 U.S. at 452)); *Bachmann
v. United States*, 134 Fed. Cl. 694, 696 (Fed. Cl. 2017) (holding that, "[w]hen private property is damaged
incident to the exercise of the police power, such damage"—even when physical in nature—"is not a taking
for the public use, because the property has not been altered or turned over for public benefit" (citing *Nat'l Bd.
of Young Men's Christian Ass'ns v. United States*, 395 U.S. 85, 92–93 (1969))).

**\*10** The Tenth Circuit also observed that, although the Supreme Court has never directly confronted the
question, it implicitly recognized such a distinction in *Bennis*, when it rejected the plaintiff's Takings Clause
claim arising from the state's forfeiture of a vehicle in which a crime had been committed, without requiring
the state to compensate the plaintiff, who shared ownership of the car and was not implicated in criminal
activity. In *Bennis*, the Court reasoned that, when the state acquires property "under the exercise of
governmental authority *other than the power of eminent domain*," the government is not "required to
compensate the owner for [that] property." *Lech*, 791 F. App'x at 716 (quoting *Bennis*, 516 U.S. at 443–44,
453–54) (alterations added by Tenth Circuit). And the Tenth Circuit itself had previously recognized the
distinction, when it held that the plaintiff failed to establish a Takings Clause violation where federal agents
physically damaged the plaintiff's property—tearing out door jambs and removing pieces of interior trim—
while executing a search warrant. *Id.* at 716–17 (citing *Lawmaster v. Ward*, 125 F.3d 1341, 1344–46, 1351
(10th Cir. 1997)).

In light of this "persuasive authority," the Tenth Circuit rejected the plaintiffs' argument that it should "disregard
the distinction between the police power and the power of eminent domain." *Id.* at 717. The court agreed with
the plaintiffs that the apprehension of a criminal suspect clearly was for the benefit of the public as a whole,
and it acknowledged the unfairness of requiring the plaintiffs to bear the costs of the apprehension when they
bore no fault in the criminal suspect's decision to take refuge in their home. Nonetheless, relying on Supreme
Court and Circuit Court precedent, the court held that, "when the state acts to preserve the 'safety of the
public,' the state 'is not, and, consistent[ ] with the existence and safety of organized society, cannot be,
burdened with the condition that the state must compensate [affected property owners] for pecuniary losses
they may sustain' in the process." *Id.* (quoting *Mugler v. Kansas*, 123 U.S. 623, 669 (1887)) (alterations added
by Tenth Circuit). The court applied a categorical rule: "when the state acts pursuant to its police power, ... its

actions do not constitute a taking for purposes of the Takings Clause," and this distinction "remains dispositive in cases that ... involve direct physical appropriation or invasion of private property." *Id.*

The court then moved on to consider whether the defendants had acted pursuant to the state's police power in that case, and it found that they had. The court recognized that the "contours of the police power are difficult to discern" but concluded that the essential question was whether the state "control[led] the use of property by the owner for the public good," as opposed to taking the property "for public use." *Id.* at 718. In considering that issue, the court examined in some detail the Federal Claims Court's decision in *Bachmann*, under facts nearly identical to those at issue in *Lech* (and here). In that case, the court rejected the plaintiffs' argument that law enforcement officials take private property for "public use" when they damage private property in the process of enforcing criminal law. *Bachmann*, 134 Fed. Cl. at 695. The court reasoned that the U.S. Marshals Service damaged plaintiffs' property while "us[ing] perhaps the most traditional function of the police power: entering property to effectuate an arrest or a seizure." *Id.* at 697. Thus, the plaintiffs did not suffer "a taking of their property for public use," and their Fifth Amendment claim failed as a result. *Id.* at 698.

Relying on *Bachmann*, the court in *Lech* further rejected any potential distinction between "(1) cases in which 'law enforcement officials seize and retain [personal] property as the suspected instrumentality or evidence of a crime' and (2) cases in which government officials inflict damage to real property that is 'incidental to the exercise of the police power.' " *Lech*, 791 F. App'x at 718 (quoting *Bachmann*, 134 Fed. Cl. at 696–98). Rejecting the plaintiffs' argument that the police power did not encompass "the destruction of an entire home in furtherance of apprehending an uncooperative suspect," the court found that the plaintiffs' home, like that in *Bachmann*, "had become instrumental to criminal activity—it was serving as a hideout for a fugitive." *Id.* (citation and internal quotation marks omitted). Thus, the court concluded, "the damage caused in the course of arresting a fugitive on plaintiffs' property was not a taking for public use, but rather it was an exercise of the police power." *Id.* (citation omitted).

*11 The court also rejected the plaintiffs' argument that the police power was limited to the power to establish laws and did not extend to the power to enforce them, finding that caselaw supported the conclusion that "[t]he government's seizure of property *to enforce criminal laws* is a traditional exercise of the police power that does not constitute a 'public use.' " *Id.* at 719 (quoting *AmeriSource Corp.*, 525 F.3d at 1153) (emphasis added by Tenth Circuit). The court also rejected the plaintiffs' assertion that the police power did not extend to the seizure of property from innocent owners. *See id.* ("[S]o long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment. The innocence of the property owner does not factor into the determination." (quoting *AmeriSource Corp.*, 525 F.3d at 1154–55 (citing *Bennis*, 516 U.S. at 453))).

And finally, the court rejected the plaintiffs' contention that extending the police power broadly enough to cover the destruction of property as occurred in that case would effectively give the government *carte blanche* to destroy property with impunity. The court found that this argument "overlooks *other* limits placed on the police power," including the limits imposed by the Due Process Clause as well as state tort law. *Id.* (citations omitted).

The court finds the analysis in *Lech* to be persuasive, and it addresses all of the plaintiffs' arguments in this case (and more). While this area of the law continues to develop, the court finds it noteworthy that neither the Supreme Court nor any federal Court of Appeals has ever held that property damage incurred in the course of executing a valid arrest warrant implicates the Fifth Amendment. Indeed, the Sixth Circuit, while not addressing the question directly, has observed that the "weight of authority holds that claims emanating from the use of police power are excluded from review under the Takings Clause." *Ostipow v. Federspiel*, 824 F. App'x 336, 342 (6th Cir. 2020). In that case, police officers found marijuana growing in a house owned by the plaintiffs but occupied by their son. They seized items connected to drug manufacturing and pursued civil forfeiture against those items and the house itself. The plaintiffs spent the next eight years asserting their right to the seized property, ultimately obtaining a favorable judgment. When the judgment was not satisfied immediately, they filed suit in federal court, asserting myriad claims, including a taking claim under the Fifth Amendment. *Id.* at 338, 339. The court affirmed dismissal of this claim, though it observed that, at first blush, the plaintiffs' description of their claim "has the feel of a taking. The government came to their home, took their property, sold it, and have yet to compensate [them]." *Id.* at 341. On "closer inspection," however, "their claims do not quite match up with traditional Takings Clause jurisprudence." *Id.* As the court explained:

> Governments seize property for different reasons, utilizing different theories of power. When a government commits a taking for public use, it does so under its civil, eminent domain powers.....
>
> Governments also seize property utilizing their police powers, which are criminal in nature. Indeed, it is well settled that a state's seizing and retaining property as part of a criminal investigation is not a "taking" for a "public purpose" under the Fifth Amendment, and thus does not give rise to a claim for just compensation.
>
> Indeed, several circuits have concluded that the use of police power to lawfully seize and retain property categorically bars a Takings Clause claim.
>
> So too here.

*Id.* at 341–42 (citing, among others, *United States v. Droganes*, 728 F.3d 580, 591 (6th Cir. 2013); *Bennis*, 516 U.S. at 452–53; *AmeriSource Corp.*, 525 F.3d at 1155; *Lech*, 791 F. App'x at 717).

*12 In sum, the weight of authority indicates that claims based on damages caused by the exercise of police power in the course of enforcing criminal laws do not provide a basis for taking claims under the Fifth Amendment. At the same time, however, several courts have found that plaintiffs have stated viable claims under the *Fourth* Amendment, where the exercise of police power was allegedly unreasonable or out of proportion to the suspected crimes. For instance, in *Denby v. City of Casa Grande*, the court summarily dismissed the plaintiffs' Fifth Amendment claim arising from police officers' near destruction of their home in the course of apprehending a suspect, on the basis that the "Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." No. CV-17-00119-PHX-SPL, 2018 WL 1586650, at *3 (D. Ariz. Mar. 31, 2018) (quoting *AmeriSource Corp.*, 525 F.3d at 1154). In later proceedings, however, the court denied the defendants' motion for summary judgment on the plaintiffs' Fourth Amendment claim arising from the same event, finding material factual disputes as to the reasonableness of the police officers' intrusion and the amount of force used. *Denby v. City of Casa Grande*, No. CV-17-00119-PHX-SPL, 2023 WL 2787759 (D. Ariz. Apr. 5, 2023). In that case, the intrusion was great, and there were material factual disputes as to the reasonableness of the police officers' belief that the suspect was inside the home (it was later discovered that he had been hiding under a tarp outside the home during the entire operation), as to whether police reasonably believed the suspect was armed and dangerous, and as to whether the destruction was either necessary or in line with the degree of risk posed by the suspect. The court recognized that, while officers executing a search warrant must occasionally "damage property in order to perform their duty," it was well established that "unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively,' may sometimes amount to a Fourth Amendment violation." *Id.* at *3 (citations omitted).

Likewise, in *Lawmaster v. Ward*, the Tenth Circuit found that the plaintiff's allegations that police officers left a pistol submerged in the dog's water bowl and spread cigar and cigarette ashes throughout his home and bedding in the course of executing a search of the plaintiff's home were sufficient to state a claim under the Fourth Amendment. 125 F.3d at 1349. Noting that "whether an officer's conduct is reasonable is a highly fact-dependent inquiry that can only be determined on a case-by-case basis," the court was "unable to hold the Agents' conduct ... was reasonably necessary to carry out the warrant's purpose to search for and seize a machine gun and parts." *Id.* at 1349–50. At the same time, however, the court found that the plaintiff did not allege a taking, even assuming the officers' conduct was unreasonable. *Id.* at 1351; *see also Johnson v. Manitowoc Cty.*, 635 F.3d at 336 (categorically rejecting the plaintiffs' Fifth Amendment claim based on police officers' destruction of his home in executing a search warrant associated with a murder investigation in which the plaintiff's tenant was a suspect on the basis that the "Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain" (citing *AmeriSource Corp.*, 525 F.3d at 1154, and *Bennis*, 516 U.S. at 452) but analyzing the plaintiffs' Fourth Amendment claim under a reasonableness standard).

In this case, the plaintiffs do not allege that police officers acted unreasonably or exceeded their authority in executing the arrest warrants and apprehending Conn. They make no attempt, that is, to state a claim under the Fourth Amendment or under state common law for trespass, which is an option if police exceed the scope of their privilege to enter property.[7] Based on all of the authority referenced above, as unfair as it seems, the court finds that the police officers' act of apprehending Conn, in the course of which they damaged the plaintiffs' home, constituted a valid use of their police power and it did not constitute a taking, for purposes of the Fifth Amendment. Because no taking occurred, the defendants had no responsibility to compensate the plaintiffs. The plaintiffs' claims under the Fifth Amendment and § 1983, therefore, will be dismissed.

### E. The Claim Under the Tennessee Constitution
*13 Article 1, section 21 of the Tennessee Constitution states "[t]hat no man's ... property [shall be] taken, or applied to public use, ... without just compensation being made therefor." The Tennessee Supreme Court has construed article 1, section 21 of the Tennessee Constitution as offering protections co-extensive with those of the Takings Clause in the Fifth Amendment. *Phillips v. Montgomery Cty.*, 442 S.W.3d 233, 244 (Tenn. 2014).[8] Thus, irrespective of whether, as the defendants argue, the plaintiffs may not bring a claim directly under the Tennessee Constitution, the claim is subject to dismissal on the merits, for the same reason that their claims under the Takings Clause of the Fifth Amendment are subject to dismissal.

### IV. CONCLUSION
For the reasons set forth herein, the court will grant the Motions to Dismiss (Doc. Nos. 14, 21). An appropriate Order is filed herewith.

### All Citations

Slip Copy, 2023 WL 5498052

| Footnotes |
| --- |
| 1 |

The RCSD letter attached to the Complaint states that Ms. Slaybaugh's son, James Jackson Conn, was the subject of felony arrest warrants for Aggravated Arson and First Degree Murder, obtained by the Tennessee Bureau of Investigation ("TBI") in connection with their investigation of the murder of a Robertson County Sheriff's Deputy. The TBI and SPD requested that the RCSD Swat Team assist in Conn's arrest due to the violent nature of the charged crimes and fears that he was "still in possession of firearms." (Doc. No. 1-2.) According to the RCSD,

"[a]fter multiple attempts over many hours to convince Mr. Conn to surrender ..., deputies completed the arrest using the safest and least intrusive means available to bring Mr. Conn into Custody," and did so "with minimal injury to Mr. Conn." (*Id.*)

2     The plaintiffs' insurance carrier also denied coverage, citing policy exclusions for damages caused by the "destruction ... of property by order of any governmental or civil authority" and for the "discharge, dispersal, release or escape of any ... gaseous ... irritant." (Doc. No. 1-3, at 1.)

3     The court finds that *Knight*, which decided what test to apply in determining whether a city ordinance effected a taking under the Fifth Amendment, is not remotely relevant to the present dispute.

4     The appeal in *Campbell* addressed only whether the deputy whose motion for summary judgment was denied was entitled to qualified immunity. To this court's knowledge, the Sixth Circuit has never expressly held that sheriff's departments in Tennessee are not government entities capable of being sued, but it has suggested as much on several occasions, and it has confirmed that when a plaintiff erroneously sues "a non-juridical police department, the plaintiff often can easily fix this error by suing the city or county that operates the department." *Lopez v. Foerster*, No. 20-2258, 2022 WL 910575, at *6 (6th Cir. Mar. 29, 2022) (citing *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994)).

5     Section 204 of the Restatement recognizes that "[t]he privilege to make an arrest for a criminal offense carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land or if the actor reasonably believes him to be there." Section 205 extends the privilege to certain other circumstances.

6     *John Corp.* involved allegations that a city demolished buildings owned by the plaintiffs without a legitimate public purpose and without just compensation, with respect to which the plaintiffs brought claims under § 1983, asserting violations of their rights under the Fifth, Eighth, and Fourteenth Amendments. Under the law in effect at the time, the Fifth Circuit affirmed the dismissal of the takings and procedural due process claims as unripe, as the plaintiffs had not brought a state inverse condemnation action; affirmed the dismissal of the Eighth Amendment claim as frivolous; but allowed the substantive due process claim under the Fourteenth Amendment to proceed. *John Corp.*, 214 F.3d at 580–81, 585–86. Because the takings claim was unripe, the court did not examine it closely, but it rejected the plaintiffs' arguments that they did *not* assert a takings claim, because they did not allege that the City used the power of eminent domain and instead relied on its police powers to destroy their property. The court stated, "such a distinction between the use of police powers and of eminent domain power, however, cannot carry the day. The Supreme Court's entire 'regulatory takings' law is premised on the notion that a city's exercise of its police powers can go too far, and if it does, there has been a taking." *Id.* at 578. This is the language the Eastern District of Texas appears to have construed as implying that police officers' destruction of property in the course of an arrest might constitute a taking.

7     Comment g to § 204 of the Restatement (Second) of Torts states that, although law enforcement officials have a privilege to enter land for the purpose of making an arrest, they may be liable for "intentionally or negligently do[ing] *unnecessary harm* to the occupants of the land or to the land or to chattels there" in the process. (Emphasis added.) The Restatement also provides that a person privileged to enter land to effect a valid arrest has an ancillary privilege to "to break and enter a fence, or other enclosure or a dwelling, *if it is reasonably necessary, or is reasonably believed by the actor to be necessary*, to accomplish the purpose of the privilege." Restatement (Second) of Torts § 213 (emphasis added).

8     In *Phillips*, the Tennessee Supreme Court expressly distinguished Tennessee and the "overwhelming majority of states" that have "used the analytical framework developed by the United States Supreme Court when adjudicating regulatory takings claims" from those states that have "interpreted comparable provisions in their own state constitutions" as providing broader protection than the United States Constitution, for example, by requiring "compensation for property 'damaged' as well as 'taken.' " *Phillips*, 442 S.W.3d at 240 & n.10 (citing opinions from the Supreme Courts of Alaska, Louisiana, Mississippi, and South Dakota construing those states' Constitutional takings provisions). It has also noted that "Article I, section 21 of the Tennessee Constitution is limited to 'property taken' and does not contain a 'damaging' clause." *Edwards v. Hallsdale-Powell Util. Dist. Knox Cty.*, 115 S.W.3d 461, 466 (Tenn. 2003).

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 THOMSON REUTERS