# United States Court of Appeals for the Fifth Circuit

---

No. 22-40644

---

United States Court of Appeals
Fifth Circuit

**FILED**

February 14, 2024

Lyle W. Cayce
Clerk

Vicki Baker,

*Plaintiff—Appellee*,

*versus*

City of McKinney, Texas,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:21-CV-176

---

ON PETITION FOR REHEARING
AND REHEARING EN BANC

Before Smith, Higginson, and Willett, *Circuit Judges.*

Per Curiam:

The petition for panel rehearing is DENIED.  The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

In the en banc poll, six judges voted in favor of rehearing (Jones, Elrod, Graves, Ho, Duncan, and Oldham), and eleven voted against rehearing

No. 22-40644

(RICHMAN, SMITH, STEWART, SOUTHWICK, HAYNES, HIGGINSON, WILLETT, ENGELHARDT, WILSON, DOUGLAS, and RAMIREZ).

No. 22-40644

Jennifer Walker Elrod and Andrew S. Oldham, *Circuit Judges*, dissenting from denial of rehearing en banc:

"The Fifth Amendment[] . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). So Vicki Baker understandably invoked that Amendment to recover from the City of McKinney the tens of thousands of dollars of property damage she suffered as a result of McKinney police efforts to protect the community from a fugitive that sought cover in her home.

The panel expressed "sympathy" for Baker. But it denied her claim based on the novel holding that history and tradition recognize a "necessity" exception to the otherwise broad protections of the Takings Clause. We are unsure whether such a privilege exists. Even if it does, we find the panel's reasoning unsatisfactory—perhaps unsurprisingly because the panel reached its ostensibly originalist conclusion without the benefit of briefing on the historical evidence.[1] We therefore respectfully regret this court's decision to deny rehearing en banc.

I

On July 25, 2020, Wesley Little went on the run with a fifteen-year-old girl. Little evaded police and then turned up unannounced at Vicki

---

[1] As the panel recognized, the Supreme Court has increasingly emphasized the importance of history and tradition in determining the meaning of the Takings Clause. *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 639–42 (2023); *Horne v. Dep't of Agric.*, 576 U.S. 350, 357–59 (2015). Analysis of this kind is a tall order. "[I]t is often exceedingly difficult to plumb the original understanding of an ancient text. Properly done, the task requires the consideration of an enormous mass of material." Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cinn. L. Rev. 849, 856 (1989). Here, the panel engaged in the historical analysis of an issue of first impression without the benefit of the parties' views of what historical evidence might be relevant and how to interpret it.

Baker's residence. Baker was not there to greet Little because she had moved to Montana, but her adult daughter Deanna Cook was occupying the residence to prepare it for sale.

When Little knocked on the door, Cook knew something was amiss because she had seen a Facebook post that morning explaining Little was a wanted man. So Cook sprang into action: She let Little into the home but told him she had to go to the supermarket. Once Cook left the house, she called Baker to describe the situation. Baker then called the police, who quickly arrived and "set up a perimeter on the home" to secure it.

The officers on scene made contact with Little using an intercom system, and before long he released the girl. But Little refused to give himself up. In fact, he explained he "had terminal cancer, wasn't going back to prison, knew he was going to die, [and] was going to shoot it out with the police." The officers knew a shootout would endanger both police and members of the general public, so they sensibly elected to shower the home with explosive devices and toxic gas grenades in hopes of forcing Little into surrender. Eventually, drone footage revealed Little had taken his own life, but not before Baker's property had been damaged to the tune of approximately $60,000.

Baker recognized the officers' conduct was beyond reproach. Still, her property was destroyed by state actors engaged in conduct designed to benefit "the community as a whole." So Baker filed a claim for property damage with the City. The City denied her claim on the ground that "there [was] no liability on the part of the City or any of its employees." When Baker's insurer likewise refused to indemnify her losses, she resorted to suing the City in federal court, contending it took her property without just compensation in violation of the Fifth Amendment. Baker moved for partial summary judgment on the question of the City's liability, and the district

court granted her motion. A jury then determined Baker was entitled to $59,656.59 in damages. On appeal, a panel of this court reversed the district court's liability determination.

## II

### A

The panel did not quibble with Baker's contention that the "plain text" of the Fifth Amendment suggests she is entitled to compensation. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022); *see* U.S. const. Amend. V ("[N]or shall private property be taken for public use, without just compensation."). Nor could it have. McKinney police destroyed Baker's property, and it did so for the public purpose of protecting the community of McKinney from a violent fugitive. It has been settled law for over 150 years that the destruction of property constitutes a taking. As the Supreme Court in *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. (11 Wall.) 166 (1871), explained:

> It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law,

> instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors.

*Id.* at 177–78.

The panel, though, concluded Baker could not rely on the plain text of the Fifth Amendment. In the panel's view, Baker needed to do something more—she needed to point to some "historical or contemporary authority that involves facts closer to those at bar and where the petitioner succeeded [in recovering] under the Takings Clause." Panel Op. at 11. But ordinarily when the plain text of a constitutional provision establishes an individual right—here, the right to compensation for confiscated property—it is *the government's burden* to demonstrate a historically grounded exception. *See Bruen*, 597 U.S. at 17 ("[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . *the government* must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.") (emphasis added).

By placing the onus on Baker to ground her right to compensation in a historical analogue—rather than requiring the City to establish some historically based exception to the compensation requirement—the panel flipped the burden that typically governs in cases involving individual rights. Thus, we fear the panel's approach risks turning the right to private property into "a second-class right." *Id.* at 71.

B

Even if we could accept the panel's inversion of the ordinary burden with respect to constitutional rights, we would still have questions about its holding. In its *sua sponte* plumbing of the historical evidence, the panel discovered that "a necessity or emergency privilege has existed in Takings

Clause jurisprudence since the Founding." Panel Op. at 12 (quotation omitted). And the panel proffered several citations to support its conclusion. *See id.* at 13–17 (citing, *inter alia*, *Republica v. Sparhawk*, 1 U.S. 357 (Penn. 1788) and *Field v. City of Des Moines*, 39 Iowa 575 (1874)).

Just one problem: none of the panel's citations establishes that a municipal government is absolved from the United States Constitution's just compensation requirement merely because the government destroyed property out of law enforcement necessity. We (1) explain the basis for the panel's holding. Then we (2) explain our skepticism.

1

At common law, any citizen could destroy property for the public use in a time of urgent necessity without subjecting themselves to liability—the so-called public necessity privilege. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 196 (1965) ("One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if the act is or is reasonably believed to be necessary for the purpose of avoiding a public disaster.").

The paradigmatic example of the privilege involved municipal fires. The destruction wrought by municipal fires before the rise of modern fire codes was often great, *see Republica*, 1 U.S. at 363 (noting half of London was burnt in the great fire of 1666), and the razing of buildings was the principal means to stop the spread. But razing buildings is tortious. So absent some privilege, an individual—whether a public official or a private citizen—who razed a building would be individually liable in tort. Obviously, a rule that stuck individuals with liability for interventions taken to halt conflagrations would deter public promoting behavior from all but the most heroic, no matter how much good could have been achieved through a well-calculated intervention. And it would seem unfair to hold people liable for doing what was necessary to cope with an emergency. So common law courts fashioned

a rule to allow individuals to tear down property when doing so was reasonably necessary to prevent the spread of a fire. *See Field*, 39 Iowa at 577–78 (citing, *inter alia*, *Mouse's Case*, 12 Coke Rep. 63 (1608)); *see also Bowditch v. Boston*, 101 U.S. 16 (1879) (finding a public necessity privilege in Massachusetts law).

Analogizing to this fire exception, courts applied the privilege in other contexts, especially war. Consider for example *Respublica*. That case arose after the Pennsylvania Board of War ordered various property held by the citizenry removed to a secure location to prevent it from falling in the hands of invading British troops. 1 U.S. at 357–58. When the impending invasion did not occur as rapidly as expected, the Board resolved to return the property to its lawful owners. But before that process was complete, the British captured the storehouse, and with it 227 barrels of flour owned by the plaintiff. *Id.* at 358. The plaintiff sued the comptroller general, alleging he was entitled to compensation for the property the War Board effectively confiscated. But the Supreme Court of Pennsylvania disagreed, noting the taking "happened flagrante bello; and many things are lawful in that season, which would not be permitted in a time of peace." *Id.* at 362.

In sum, the public necessity privilege operated at *common law* actions to privilege actions taken during certain emergencies that would otherwise have been tortious.

2

The panel held—on the basis of the *tort law* public necessity privilege—that citizens are not entitled to just compensation under the Takings Clause when their property is damaged by law enforcement officers, so long as the officers' conduct was reasonably necessary to prevent an imminent public emergency. We have doubts about that holding for three reasons.

First, the cases on which the panel relied most heavily—*Field* and *Republica*—did not interpret the Takings Clause at all. That is because both of those cases involved claims predicated exclusively on state law, and they all arose before the Supreme Court's decision in *Chi., Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226 (1897), which incorporated the Takings Clause against the states. Thus, for obvious reasons neither of those cases so much as referenced the Fifth Amendment.

It is true that cases addressing the pre-constitutional scope of a right are often relevant to the breadth of constitutional guarantees. *See, e.g.*, *Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (citation omitted) (emphasis in original). But it is unclear how to think about the interaction between common law limitations on property rights and the Takings Clause because it appears that Clause effected a reversal of the pre-constitutional English common law rule that the government could take property without supplying any compensation. *See* William Michael Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 YALE L.J. 694, 697 n.9 (1985) ("At the time of the American Revolution, the principle that the state was obligated to compensate individuals when it took their property had not won general acceptance in England.") (citing *British Cast Plate Mfrs. Co. v. Meredith*, 100 Eng. Rep. 1306 (1792)); *see also* Derek T. Muller, *As Much upon Tradition as upon Principle: A Critique of the Privilege of Necessity Destruction under the Fifth Amendment*, 82 NOTRE DAME L. REV. 481, 497–498 (2006) ("At English common law, the government as sovereign owed no compensation for any taking, destruction or otherwise, unless parliament granted it.").

The Supreme Court has suggested the public necessity privilege has some implication for proper interpretation of the Takings Clause. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 n.16 (1992). But the Court has

never held that anything that would have been privileged by public necessity at common law is non-compensable under the Fifth Amendment.[2]

And for good reason. The public necessity privilege makes sense enough if the burden of a public-serving intervention has to fall on either the victim of property destruction or the heroic intervenor. But the Supreme Court has told us the Takings Clause was designed precisely to ensure the burden of a public-serving interference with an individual's right to the enjoyment of his property is borne not by the individual alone but rather "by the public as a whole." *Armstrong*, 364 U.S. at 49. And today, unconstitutional takings are most often remedied through suits against governmental entities, not individual officials. In fact, it is disputed whether individual officials may be individually liable in damages for violating the Takings Clause at all. *See Vicory v. Walton*, 730 F.2d 466, 467 (6th Cir. 1984) ("[W]e can find [no case] that suggests that an individual may commit, and be liable in damages for, a 'taking' under the fifth amendment."). *But see O'Connor v. Eubanks*, 83 F.4th 1018, 1026 (6th Cir. 2023) (Thapar, J., concurring). So it is unclear whether or to what extent the public necessity privilege should inform our takings jurisprudence.[3]

---

[2] To the extent the Supreme Court has embraced a necessity exception to the Takings Clause, the Court has certainly never held that exception encompasses law enforcement necessity. *See* Muller, *supra* at 499–500 ("The federal issue of [law enforcement necessity] takings has been lightly skirted or flatly ignored, and the nagging question of the Fifth Amendment remains unaddressed in these cases where necessity has been invoked.").

[3] If individual officials can be liable in damages for violations of the Takings Clause, the public necessity privilege may supply a basis for immunizing officials from liability. *Cf. Mitchell v. Harmony*, 54 U.S. 115, 134 (1851) ("There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public

Second, and relatedly, it seems to us that exempting some kinds of takings from the just compensation requirement on the basis of the public necessity privilege is fundamentally at odds with the purpose of the Takings Clause. In fact, common law courts justified the privilege by baldly exclaiming "that a private mischief is to be endured rather than a public inconvenience." *Field*, 39 Iowa at 577 (citation omitted). Or alternatively, that "*[s]alus populi suprema est lex*"—the welfare of the people shall be the supreme law. *Ibid.* But of course all takings are calculated to eliminate a public inconvenience or to serve the public welfare; that is the logic of the public use requirement. Thus, if the bare maxim that the welfare of the people shall be the supreme law could be invoked to render a taking non-compensable, compensation would never be required.

Consider for example *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984). In that case the Court held that the Hawaii legislature was permitted to take property on the ground that the welfare of the public would be served by eliminating the "social and economic evils of a land oligopoly." *Id.* at 241–42. Could the legislature also have invoked the necessity privilege to avoid the compensation requirement? After all, the legislature thought the taking was necessary precisely because the pre-existing distribution of property inconvenienced the public, and it is apparently a maxim of the law "that a private mischief"—like losing title to one's land—"is to be endured rather than a public inconvenience." *Field*, 39 Iowa at 577 (citation omitted).

Fanciful as that reasoning may sound, it could at least plausibly be grounded in common law precedent. Consider *The Case of the King's Prerogative in Salt-Peter*, 12 Coke Rep. 12 (1606). There, Lord Coke held the King could enter private lands to dig for saltpeter—a necessary component

---

use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; *but the officer is not a trespasser*." (emphasis added)).

of gunpowder. And he justified that holding in part by analogy to the fire exception. In Coke's view, men "shall suffer damage" for the Commonwealth, "as for saving of a City or Town a house shall be plucked down if the next be on fire." *Id.* at 13 (quotation omitted). That principle, Coke explained, suggests men shall suffer the Crown's "taking of saltpeter" because it "is a purveyance of it for the making of gunpowder necessary for the defense and safety of the realm." *Ibid.* (quotation omitted). In other words, Coke apparently thought the principle that a man must suffer the loss of his home when necessary to stop the spread of a fire could be extended such that a man must also suffer the King's officers entering his land to take his property when necessary for the safety of the country.

The Pennsylvania Supreme Court employed similar reasoning in *Republica*. Like Coke, the Court explained the legislature could impress "articles that were necessary to the maintenance of the Continental army," and they could do so without providing just compensation. *Republica*, 1 U.S. at 363.

There is no conceivable reading of the Fifth Amendment under which the government could confiscate private property to supply the military without compensating the owner. As George Tucker explained, the confiscation of private property to supply the Continental army is probably the thing that gave rise to the Takings Clause in the first place. *See* St. George Tucker, 1 Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 305–06 (1803) (noting the Takings Clause was "probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army . . . without any compensation whatever"). Surely the fact that common law courts extended the necessity principle so far as to privilege takings that unequivocally require compensation under our

Constitution raises some questions about the constitutional viability of a public necessity exception to the Takings Clause.

Third, even assuming the panel's principal citations help to establish the scope of the Takings Clause, they would not necessarily establish the broad law enforcement necessity exception the panel read into them.

*Field* held only that a plaintiff was not entitled to compensation after an officer of a municipal government tore down his house amidst a conflagration raging through the city. *See* 39 Iowa at 577–78. But the fire exception differs materially from the panel's law enforcement necessity exception. That is because if public officials declined to preemptively destroy some buildings amidst a conflagration, those buildings were likely to go up in flames anyways, and more with them. Victims could hardly claim an entitlement to compensation when public officials did to their buildings what the fire was already likely to do. In fact, one might say when an official destroyed property to halt a conflagration, the destruction was really caused by the fire, and the intervening official merely hastened it.

Similarly, the holding of *Respublica* was merely that under Pennsylvania law as it existed in 1788, the Pennsylvania Congress was permitted, in times of war, to "direct the removal of any articles that were . . . useful to the enemy, and in danger of falling into their hands." *Id.* at 363. That makes sense. If a citizen is likely to lose his property to an invading enemy, he cannot really complain when his elected representatives take it first.

All the Supreme Court's cases countenancing the public necessity exception share this characteristic of inevitable loss. Consider *United States v. Caltex*, 344 U.S. 149 (1952). There, the Supreme Court held the government had no obligation to compensate a plaintiff whose property was destroyed by the army amidst a military invasion. *Caltex* referenced the

public necessity privilege, but it by no means elevated that privilege to the status of a constitutional principle. Instead, the basis of the Court's holding was that the government is privileged to order the destruction of property in wartime "to prevent the enemy from realizing any strategic value from an area which he was soon to capture." *Id.* at 155.[4] In other words, the Court explained that when government destroys property an invading enemy was likely to seize anyways, it is not really the government that causes the loss. Rather, the loss is caused by the invading enemy, and so it "must be attributed solely to the fortunes of war, and not to the sovereign." *Id.* at 155–56. For that reason, the Takings Clause supplies no remedy.[5]

McKinney police, in contrast, did not merely hasten a loss that would have inevitably befallen Baker. But-for their intervention, Baker's home would have remained in her possession, and in pristine condition to boot. It therefore appears to us this case differs substantially from the paradigmatic

---

[4] The Court was careful to limit its holding. It explained that "[n]o rigid rules can be laid down to distinguish compensable losses from noncompensable losses. Each case must be judged on its own facts." *Id.* at 156.

[5] *Caltex* cited *Juragua Iron Co. v. United States*, 212 U.S. 297 (1909), but that was not a public necessity case. In that case the Court considered whether the United States had a constitutional obligation to compensate a corporation for property the army destroyed to prevent the spread of Yellow Fever in Cuba during the Spanish-American War. The Court held the Fifth Amendment required no compensation, but it did not do so on the basis of some public necessity privilege. Rather, the Court explained that the "corporation, doing business in Cuba, was, during the war with Spain, to be deemed an enemy to the United States with respect of its property found and then used in that country, and such property could be regarded as enemy's property, liable to be seized and confiscated by the United States in the progress of the war then being prosecuted." *Id.* at 306. And even if the corporation's property was not properly regarded as enemy's property, the taking might nonetheless have been justifiable on the ground that property that endangers the public health effects a public nuisance. *See, e.g.*, *Mugler v. Kansas*, 8 S. Ct. 273, 287 (1887) ("The right to compensation for private property taken for public use is foreign to the subject of preventing or abating public nuisances.").

No. 22-40644

example of a public necessity at common law, and from any exception to the Takings Clause the Supreme Court has ever embraced.

III

In sum, while McKinney police acted shrewdly, their actions also left Baker $60,000 in the hole. There is no doubt the McKinney community was better off because its officers ravaged Baker's home. But it is at least peculiar to say that because the officers' conduct benefited the community, the community can avoid compensating Baker for the inconveniences she incurred on its behalf. The panel apparently thought that was the result the law required. If the panel was right, so be it. But there can be no denying that the text of the Fifth Amendment and the Supreme Court's precedents at least *suggest* otherwise. *See, e.g.*, *Armstrong*, 364 U.S. at 49. Thus, it should have been the City's burden to establish its conduct was excepted from the strictures of the just compensation requirement. And even assuming the panel was entitled to shoulder that burden on the City's behalf, we are not sure the panel carried it.

\*    \*    \*

This case undoubtedly presents difficult questions.[6] The panel's answers left Vicki Baker to bear a $60,000 burden on behalf of her community. Respectfully, we are not sure the panel got it right, so we would give Baker a chance to make her case before our en banc court.

---

[6] Because not all damage results in a taking and because there are a variety of exceptions to the Takings Clause, reconsideration of the panel's interpretation does not risk opening the floodgates to suits for minor damage. Nor does it risk a flood of liability against individual officers.